USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8-6-09_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
DANIEL C. ELLINGTON,                :
                                    :
                    Plaintiff,      :
                                    :        08 Civ. 7366 (VM)
        - against -                 :
                                    :        **DECISION AND ORDER**
MICHAEL J. ASTRUE,                  :
Commissioner of Social Security,    :
                                    :
                    Defendant.      :
--------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiff Daniel C. Ellington ("Ellington") brought this action pursuant to 42 U.S.C. § 405(g) ("§ 405(g)"), seeking review of the final determination by the Commissioner of Social Security (the "Commissioner") denying Ellington's claim for Social Security Disability Insurance ("SSDI") benefits under the Social Security Act, 42 U.S.C. §§ 301-1397jj (the "Act"). Ellington now moves for a judgment on the pleadings, seeking a reversal of the Commissioner's final administrative determination and a remand of this action for either calculation of benefits or further proceedings. The Commissioner cross-moves for a judgment on the pleadings. For the reasons stated herein, Ellington's motion is GRANTED in part and DENIED in part, and the Commissioner's cross-motion is DENIED in its entirety.

## I. BACKGROUND

A.   UNDERLYING HISTORY

On September 23, 2005, Ellington filed an application for SSDI benefits, claiming that he was unable to work because of back pain stemming from an injury at work. After his initial application was denied on December 27, 2005, he filed a request for a hearing to challenge that denial. The hearing was held on March 6, 2007 (the "Hearing"), before Administrative Law Judge James Reap (the "ALJ"), who considered the case de novo on behalf of the Commissioner.

In a decision dated November 16, 2007, the ALJ determined that Ellington did not suffer from any disability as defined in 42 U.S.C. § 423(d) and thus was not eligible for SSDI benefits. On June 27, 2008, the Appeals Council denied Ellington's request for review, and the ALJ's decision became the final decision of the Commissioner. Pursuant to § 405(g), this Court now reviews the Commissioner's decision.

B.   THE EVIDENCE

The evidence presented at the Hearing indicates that Ellington began receiving treatment for back pain after an April 2005 injury. The record includes the following facts.[1]

1.   Ellington's Background

Ellington was born in 1966 and was thirty-eight years old on April 29, 2005, the alleged disability onset date. He held

---

[1] This factual background is derived from the certified transcript of the administrative record filed with the Court as part of the Commissioner's answer ("Tr."). Unless specifically referenced, no further citation to this source will be made.

various jobs in the years before his disability application, working as a truck driver, a tire changer in an auto parts store, and in retail at both a beer store and BJ's Wholesale Club. In May 2004, Ellington took a job in a group home for adults with mental disabilities. At the group home, Ellington was responsible for performing household duties: laundry, cooking, shopping, and taking the residents out to dinners or the movies. Ellington remained at that job until April 29, 2005, the date of the injury.

Ellington has two third degree assault convictions from the late 1990s and one felony conviction for attempted sale of a controlled substance from the 1980s. These circumstances had some bearing here in the ALJ's determinations regarding Ellington's credibility.

2.   The Injury

On the evening of April 29, 2005, Ellington was working at the group home when one of the home's residents, who was in a "rare mood," attacked him. (Tr. 94, 200-201.) Ellington fell backwards down some stairs as he grappled with the resident. The following morning, Ellington went to the emergency department of Orange Regional Medical Center, complaining of pain in his lower back that radiated down his right leg. His examination at the hospital showed a non-tender lumbar spine (lower back), negative straight leg

-3-

raising bilaterally, and intact sensation.  The x-ray of his
lumbar spine was negative.  Ellington was diagnosed with a
lower back strain.  The doctor prescribed Vicadin for pain,
told him not to do any pushing or pulling, and recommended he
stay home and rest for two days.

### 3.  Records from Treating Physicians

On May 23, 2005, Ellington sought treatment for his neck
and lower back pain from Dr. John Handago ("Handago").
Handago found spasm and a diminished range of motion in both
Ellington's cervical spine (his neck) and lumbar spine.  The
cervical compression test was positive right, and the straight
leg raising test was positive right, negative left.  Handago
rated Ellington's ankle reflexes as one to two bilaterally,
and he found that Ellington had hypesthesias (an abnormally
decreased sensitivity) in the back of his right foot.
Ellington's motor function was grossly intact, and his
reflexes and motor and sensory functions were also grossly
intact for the upper extremities.  Handago took an x-ray of
Ellington, and he interpreted the x-ray as revealing a loss of
lumbar lordosis with no acute fracture, spondylolysis, or
spondylolisthesis. Handago diagnosed Ellington with herniated
nucleus pulposus (a herniated disk) in both the lumbar spine
and cervical spine.   He prescribed several medications,
recommended physical therapy, and asked that Ellington return

-4-

in three weeks. He indicated that Ellington was "totally disabled." (Tr. 100.)

Handago continued to treat Ellington, seeing him at least thirteen times from May 2005 through February 2007. His medical findings often mirrored the results from the first appointment. He noted a diminished range of motion and spasms in Ellington's lumbar spine and cervical spine during each visit except for the visit of July 5, 2005, when he made no mention of findings regarding the cervical spine. He continued to find intact reflexes for the upper extremities. The results of the straight leg raising test varied, with positive findings during some visits and negative findings during others. He generally rated Ellington's ankle reflexes as zero to one or one to two, but found the ankle reflexes to be intact for the final three appointments on the record. He found the cervical compression test to be positive in three of the initial appointments but found negative results on November 21, 2005 and continued to find negative results thereafter. He found hypesthesias in the right foot on one occasion (in addition to his finding on the first visit) and found hypesthesias in the left hand during seven visits.

Handago continued to restate his diagnosis of a herniated disk for both the lumbar and cervical spine, although he diagnosed a cervical sprain instead of a cervical herniated

-5-

disk on June 16, 2005 and did not evaluate the cervical spine on July 5, 2005. He continued to prescribe physical therapy and pain management medication. He consistently described Ellington as "totally disabled." (Tr. 99-101, 149, 155-161.)

In addition to the treatment he provided, Handago summarized his findings by filling out a Social Security Administration form, entitled "Medical Source Statement of Ability to Do Work-Related Activities (Physical)," on three occasions: July 17, 2005, November 14, 2006, and February 6, 2007. Handago generally noted similar limitations on all three forms, saying that Ellington could not repeatedly lift or carry any amount of weight, was limited in his ability to push and pull, was limited in his ability to reach and handle objects, could not climb, and could not sit for six hours in an eight-hour workday. On the 2005 form, Handago stated that Ellington could not stand for two hours in an eight-hour day, but by 2006 and 2007 he did find that Ellington could stand for at least two hours. In 2005, Handago said Ellington could occasionally lift a weight of less than ten pounds; in 2006 he said Ellington could occasionally lift a weight of up to twenty pounds; and in 2007 he said Ellington could occasionally lift a weight of up to ten pounds. On all three forms, Handago based his conclusions on the pain that Ellington would experience from his disc herniation, although

-6-

on the 2005 form Handago described herniation only in the lumbar spine, while on the 2006 and 2007 forms he noted herniation in the cervical spine as well.

Two other doctors also examined Ellington as part of his treatment. Dr. Timothy Greenan ("Greenan") interpreted an MRI exam of Ellington's lumbar spine on June 24, 2005. Comparing the results to an MRI taken of Ellington's back in 2001, Greenan found a worsening of discogenic disease and diffuse posterior disc bulges in the lumbar spine. He also found that Ellington had a mild degree of central canal spinal stenosis.

In addition, Dr. David Segal ("Segal"), a neurosurgeon, examined Ellington on August 30, 2005. Segal said that Ellington reported that his back pain averaged a four on a scale of one to ten, and had reached greater than ten. He noted that Ellington had numbness, tingling, and weakness in his legs. Like Handago, Segal found Ellington had a limited range of motion in his back, that his motor functions were normal, and that he had decreased sensation in one of his feet (although Segal found the decreased sensation in the left L5 dermatome, the left foot, in contrast to Handago's finding of decreased sensation in the right foot). Segal concluded that Ellington was complaining primarily of mechanical low back pain and that he probably had traumatic facet arthropathy. He did not recommend surgery, but instead recommended facet

-7-

injections and radiofrequency ablation.

### 4. Evaluations by the Non-Treating Physician

On November 30, 2005, after Ellington applied for SSDI benefits, he was evaluated by Dr. John M. King ("King"), who served as a consultative examiner at the request of the Commissioner.   King found no tenderness to palpation in Ellington's cervical spine.   He found reflexes, muscle testing, and sensation in both the upper and lower extremities to be normal.  The straight leg raising test was positive for pain at a sitting angle of 60 degrees, but was negative at an angle of 90 degrees.  King noted that Ellington complained of tenderness in the lumbar spine during the exam.  He found that an x-ray of Ellington's lumbar spine showed a mild decrease in joint space and very minimal anterior spurring.    King concluded that Ellington had a sprain in both the cervical and lumbar spine and did not have disc disease.  He recommended that Ellington avoid repetitive flexion and extension of the lumbar spine.

### 5. Other Medical Evidence

Ellington attended physical therapy sessions at Hudson Valley Sports and Physical Therapy from June 2005 through September 2005.  Ellington reported pain at four on the scale of one to ten at his first visit on June 20.   Ellington reported feeling better on his visit on June 29, but said his

lower back pain was a five on the scale of one to ten on his July 5 visit. On August 1, Ellington told his physical therapist that on some days, the pain lasted for an hour, while at other times the pain last for a week. On August 15, Ellington said he had met his goal of being able to lift and carry a twenty-pound child. On August 25, Ellington said his pain was a one on a scale of one to ten. Ellington missed the majority of his scheduled physical therapy appointments, attending nine out of twenty-one sessions.

### 6. Ellington's Testimony

Ellington testified before the ALJ on March 6, 2007. Ellington told the ALJ that he could not work at a desk job because of his back pain, saying the pain increased after sitting for just fifteen minutes. He described the pain as continuous but becoming more "intense" at certain points of the day. (Tr. 195.) On a scale of one to ten, Ellington rated the pain on a good day as between seven and eight, possibly an eight and a half, decreasing to six and a half to seven with medication. He said the pain radiated from his back to his hips, neck, and down his leg. Ellington said that he generally had trouble sleeping, tossing and turning throughout the night.

Ellington testified that he lived with his fiancée and his three daughters, ages two, seven, and twenty-one, and that

-9-

the twenty-one-year-old daughter helped take care of the younger children. He said he drove occasionally for local errands, and that the longest trip he had taken over the past year was to appear at the Hearing. He said that he was able to take public transportation. Ellington testified that he did not cook, do laundry, go shopping, or exercise, but that he did try to take walks around his neighborhood, go for short drives, and socialize "from time to time." (Tr. 203, 205, 208.) He stated that his fiancée helped him wash in the shower because he was unable to bend down and clean his legs. Ellington said he had stopped pursuing his hobby, working on motorcycles and cars, after the accident.

## C. MOTION FOR JUDGMENT ON THE PLEADINGS

Pursuant to Federal Rule Civil Procedure 12(c), Ellington and the Commissioner now move for judgment on the pleadings. Ellington argues that the Court should reverse the Commissioner's ruling on the ground that ALJ did not follow administrative procedure in making his decision. Specifically, Ellington claims that: 1) the ALJ failed to properly evaluate the medical opinions in the record; 2) the ALJ did not adequately assess the credibility of his allegations of pain and limitations, and 3) the ALJ failed to adequately develop the record. The Commissioner argues that the ALJ properly gave the opinions of Ellington's treating

-10-

physicians little weight because substantial evidence in the record contradicted their conclusions.

The Court agrees with Ellington that the ALJ did not properly explain the weight he accorded the opinion of the treating physician and did not assess the credibility of Ellington's allegations of pain according to applicable law. The Court, however, disagrees with Ellington's assertion that the ALJ failed to adequately develop the record. The Court thus remands the case to the Commissioner to reconsider the evidence in a manner consistent with this ruling.

## II. **DISCUSSION**

### A.   STANDARD OF REVIEW

Under the Act, "the [federal district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." § 405(g). The Court's review of a disability determination consists of two steps.   See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987).   First, the Court must decide "whether [the Commissioner] applied the correct legal principles in making the determination."   Id.   Second, the Court must decide "whether the determination is supported by 'substantial evidence.'"   Id. (quoting 42 U.S.C. § 405(g)).   Even if the

-11-

Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision. See id. at 986.

With respect to the second step, "the term 'substantial' does not require that the evidence be overwhelming, but it must be 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Miller v. Barnhart, No. 01 Civ. 2744, 2004 WL 1304050, at *5 (S.D.N.Y. May 6, 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Where substantial evidence does exist, the Commissioner's determination of fact is conclusive, even where the reviewing court disagrees. See Rutherford v. Schweiker, 685 F. 2d 60, 62 (2d Cir. 1982). Thus, the reviewing court is precluded from undertaking a de novo review. See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).

B.   DISABILITY DETERMINATIONS

The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).   The effect of the physical or mental impairment must be

-12-

of such severity that [the claimant] is not only unable
to do his previous work but cannot, considering his age,
education, and work experience, engage in any other kind
of substantial gainful work which exists in the national
economy, regardless of whether such work exists in the
immediate area in which he lives, or whether a specific
job vacancy exists for him, or whether he would be hired
if he applied for work.

Id. § 423(d)(2)(A).

The Commissioner must apply a five-step procedure to

assess disability claims.   See 20 C.F.R. § 404.1520(a)(4).

The Second Circuit has described the process as follows:

First, the [Commissioner] considers whether the claimant
is currently engaged in substantial gainful activity.  If
he is not, the [Commissioner] next considers whether the
claimant has a "severe impairment" which significantly
limits his physical or mental ability to do basic work
activities.  If the claimant suffers such an impairment,
the third inquiry is whether, based solely on medical
evidence, the claimant has an impairment which is listed
in Appendix 1 of the regulations.  If the claimant has
such an impairment, the [Commissioner] will consider him
disabled without considering vocational factors such as
age, education, and work experience ...  Assuming the
claimant does not have a listed impairment, the fourth
inquiry is whether, despite the claimant's severe
impairment, he has the residual functional capacity to
perform his past work.   Finally, if the claimant is
unable to perform his past work, the [Commissioner] then
determines whether there is other work which the claimant
could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)

(alteration in original)).

At any step, if the Commissioner can make a finding that

the claimant is disabled or not disabled, he must do so and

-13-

the process need not continue.  <u>See</u> 20 C.F.R. §
404.1520(a)(4).  If the Commissioner cannot make such a
determination, then he must continue to the next step.  <u>See</u>
<u>id.</u>  The burden proof at the first four steps falls on the
claimant.  <u>See</u> <u>DeChirico v. Callahan</u>, 134 F.3d 1177, 1180 (2d
Cir. 1998).  If the process proceeds to the fifth step, then
there is a limited burden shift: the Commissioner has the
burden of proving that work exists in the national economy
that the claimant can perform, but need not provide any
additional evidence regarding the claimant's residual
functional capacity.  <u>See</u> 20 C.F.R. § 404.1560(c)(2); <u>Poupore</u>
<u>v. Astrue</u>, 566 F.3d 303, 306 (2d Cir. 2009).

On behalf of the Commissioner, the ALJ applied the five-
part test for determining whether Ellington was disabled and
concluded that: (1) Ellington was not gainfully employed; (2)
Ellington suffered from a severe impairment, a back disorder;
(3) Ellington did not have an impairment that is listed in
Appendix 1 of the regulations; (4) Ellington did not have the
residual functioning capacity to perform his past work; (5)
Ellington did have the residual functioning capacity to
perform the full range of sedentary work, and that jobs exist
in significant numbers in the national economy that Ellington

-14-

could perform.[2]  Because the ALJ found that Ellington had no disabilities and was capable of working certain jobs, he denied Ellington's request for SSDI benefits. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Ellington's request for review.

Ellington challenges the ALJ's determination that he has the residual functioning capacity to perform sedentary work. The ALJ focused on several pieces of evidence in making his determination that Ellington was physically capable of working at a desk job.  He noted that Ellington had no history of hospitalizations for his back impairment; that the MRI showed disc herniation with only mild stenosis; that physical examinations showed Ellington had intact reflexes and motor and sensory functions; that Segal determined that Ellington was not a candidate for surgery; and that King made only minimal findings in his examination.  The ALJ discredited Ellington's statements of disabling pain, saying that Ellington's previous criminal convictions undermined his credibility and that his drives and walks around the neighborhood were evidence that he led an "active existence." (Tr. 18).  The ALJ also explained why he did not give

---

[2] The Social Security Administration defines "sedentary work" as involving the lifting of objects that weight no more than ten pounds, sitting for about six hours out of an eight-hour workday, and standing or walking for no more than two hours out of an eight-hour workday.  See Social Security Ruling 83-10 (available at http://ssa.gov/OP_Home/rulings/di/02/SSR83-10-di-02.html).

-15-

controlling weight to the opinion of Handago, the treating physician.    He noted that Handago repeatedly diagnosed Ellington with disc herniation in the cervical spine without medical findings supporting the diagnosis.  He also described Handago's opinions as inconsistent with the findings of Segal and King and with Ellington's daily activities, as well as being internally inconsistent in that in one report Handago found that Ellington could lift up to twenty pounds, while in another report he found that Ellington could only carry objects weighing less than ten pounds.

## C.    THE OPINION OF THE TREATING PHYSICIAN

The opinion of a claimant's treating physician should be given controlling weight over other medical opinions as long as it is "well supported by medical findings and not inconsistent with other substantial evidence." Rosa, 168 F.3d at 78-79; see also 20 C.F.R. § 416.927(d)(2).   Giving deference to the opinion of a treating physician over a consulting physician reflects the principle that opinions stemming from a doctor-patient relationship are generally more reliable than medical opinions based on examinations that are undertaken solely for the purpose of the disability hearing. See Schisler v. Sullivan, 3 F.3d 563, 567-568 (2d Cir. 1993) (finding that regulations that give deference to the treating physician are reasonable).

Even if the treating physician's opinion is contradicted by substantial evidence and thus is not controlling, the opinion is still entitled to significant weight because "the treating source is inherently more familiar with a claimant's medical condition than are other sources." Gonzales v. Callahan, No. 94 Civ. 8747, 1997 WL 279870, at *11 (S.D.N.Y. May 23, 1997) (citing Schisler v. Bowen, 851 F.2d 43, 47 (2d Cir. 1988)). If not controlling, the proper weight given to a treating physician's opinion depends upon: (1) the length and frequency of the treatment relationship; (2) the nature and extent of the relationship; (3) the amount of evidence the treating physician presents in support of his or her opinion; (4) the consistency of the opinion with the record as a whole; (5) the treating physician's specialization in the relevant area; and (6) other factors. See 20 C.F.R. § 404.1527(d)(2)-(6). If the ALJ does not articulate "good reasons" for the weight he accords to a treating physician's opinion, then the district court may remand for a comprehensive explanation of the ALJ's reasoning. See Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

The ALJ here determined that substantial evidence contradicted the treating physician's findings. Specifically,

he found that Handago's conclusion that Ellington was "totally disabled" was inconsistent with the findings of King, the findings of Segal, and Ellington's description of his own daily activities.  While this Court may not completely agree with the ALJ's rationale, the Court does agree that King's findings comprise substantial evidence that is inconsistent Hadango's conclusion.  Handago diagnosed Ellington with a herniated disc in both the cervical and lumbar spines; in contrast, King concluded that Ellington only had a sprain in the cervical and lumbar spines and did not have disc disease. This contradiction is enough to support the ALJ's finding that Handago's opinions were not controlling.

However, the Court finds that the ALJ committed legal error in not describing how much weight he did accord to Handago's opinion once he determined that it was not controlling or why he determined that particular weight was appropriate.   Therefore, the Court remands the case to the Commissioner to correct this legal error.[3]   The regulations are clear that a treating physician's opinion should not be

_____

[3] Ellington urges the Court to award him disability benefits and remand to the Commissioner for the sole purpose of the calculation of those benefits.     However, the Court notes that it is the role of the Commissioner, not the Court, to weigh the evidence, and that awarding benefits instead of remanding for further proceedings is appropriate in cases where there is "overwhelming proof" of disability.     See Shaw v. Chater, 221 F.3d 126,   135 (2d Cir. 2000).    Here, there is no such "overwhelming proof," as the evidence goes both ways: Handago repeatedly maintained that Ellington was totally disabled due to disc disease, while King said Ellington did not have disc disease and only needed to avoid repetitive flexion and extension of the lumbar spine.

-18-

completely rejected if that opinion is found to be non-controlling. See 20 C.F.R. § 404.1527(d)(2). Instead, the ALJ should weigh the treating physician's opinion along with other evidence according to the factors described above. The ALJ did address the third and fourth factors – the extent to which the evidence supports the physician's conclusions and the extent to which the physician's conclusions are consistent with other evidence – as part of his discussion of whether Handago's opinion should be considered controlling. However, the ALJ made no mention of important factors such as the length and the frequency of the treating relationship.

Certainly, it is within the ALJ's discretion to conclude that the weight of the evidence supported King's findings and not Handago's. However, especially given that Handago saw Ellington at least thirteen times over the course of almost three years and that King saw Ellington only once, the ALJ was obligated to give a more complete explanation as to why the balance of factors pointed against Handago's conclusions. The requirement that the ALJ give specific reasons for his determination is more than just a bureaucratic box to check; it is an important aspect of achieving a just result in disability cases. As the Second Circuit explains,

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even – and perhaps especially – when those dispositions are unfavorable. A claimant ... who knows that her physician

-19-

has deemed her disabled, might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.

Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (citing Jerry L. Mashaw, Due Process in the Administrative State 175-76 (1985)).

The elucidation of a rationale is particularly important in the present case where the ALJ appears to have accepted some of Handago's findings, while simultaneously rejecting Handago's ultimate conclusion. It appears that the ALJ agreed with Handago's finding of a herniated disc in the lumbar spine, as the ALJ noted that the MRI did show evidence of a disc herniation. In addition, the ALJ found that "the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms." (Tr. 16). Given that the ALJ appears to have agreed with Handago's findings that Ellington had a herniated disc in the lumbar spine and that a herniated disc could cause disabling pain, it is all the more important for the ALJ to clearly state the reasons he found Handago to be credible on those issues but not credible on the issue of whether Ellington actually experienced disabling pain.[4]

_____

[4] Ellington further argues that the ALJ committed legal error in evaluating the medical evidence by substituting his own judgment for that of a physician. In particular, Ellington argues the ALJ concluded that there was no basis for Handago's finding of a herniated disc in the cervical spine (as opposed to the lumbar spine). The Court disagrees. The ALJ did

-20-

The Court also notes that it is important for the ALJ not only to give reasons for his determination, but to give "good reasons." See Halloran, 362 F.3d at 32-33; Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998). A reason grounded on a legal error is not a good reason. See Schaal, 134 F.3d at 505 (finding that the ALJ's rationale for rejecting the treating physician's testimony - that the testimony was not based on clinical findings - misunderstood the law in that it ignored the requirement that the ALJ develop the medical record in cases where clinical findings are inadequate). Here, the ALJ's analysis regarding the consistency of Handago's conclusions with the other evidence on the record, which the ALJ conducted in determining Handago's opinion was not controlling, raises some concerns. Because this analysis is also applicable to the multi-factor analysis regarding the weight to be accorded this evidence that the Commissioner should conduct on remand, the Court will discuss its concerns herein.

First, the ALJ found that Handago's findings were internally inconsistent, in that on one occasion Handago found that Ellington could lift twenty pounds occasionally and on another occasion he found Ellington could lift only ten

---

not substitute his own judgment, but instead relied on King, who found a sprain, not a herniated disc, in the cervical spine.

pounds. The Court notes, however, that in some cases two medical opinions can be consistent even if there are some differences in medical findings. See, e.g., Parker v. Harris, 626 F.2d 225, 233 (2d Cir. 1980) (concluding that a non-treating physician's opinion was consistent with a treating physician's opinion, despite some difference in medical findings, because both doctors found major functional limitations). Thus, it is important for the ALJ to explain why this particular difference in medical findings is substantial, particularly because Ellington stated his condition varied from day to day. Second, the fact that Segal did not recommend Ellington for surgery is not necessarily evidence that Segal disagreed with Handago regarding Ellington's disability. See, e.g., Shaw v. Chater, 221 F.3d 126, 134-135 (holding that opting for conservative treatment instead of surgery is not substantial evidence that the claimant was not disabled). Finally, that the claimant admits to taking short walks and other limited activities is not evidence of a contradiction with a positive disability determination, an issue discussed at greater length below. The Court directs the Commissioner to consider these legal principles while weighing the evidence on remand.

D. THE CREDIBILITY ASSESSMENT OF ELLINGTON

The ALJ also committed legal error in analyzing

-22-

Ellington's alleged symptoms, and the Court finds that this legal error is also a cause for remand. In assessing whether or not a claimant's allegation of disabling pain is credible, the ALJ should consider the claimant's daily activities. See 20 C.F.R. § 404.1529(c)(3). If a claimant performs housework on a daily basis, the ALJ can consider such work as evidence that the claimant is not disabled. See Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980) (concluding that evidence that a claimant who frequently cooks, makes beds, washes clothes, sews, and goes shopping is consistent with a finding that she was not disabled). Even if the claimant engages in occasional activities outside the house, however, the claimant may still be disabled. On this point, the Second Circuit's analysis in Balsamo v. Chater is instructive:

> Finally, although Balsamo testified that he rarely left his house — "periodically" to attend church and "on an occasion" to help his wife go shopping — the ALJ concluded that Balsamo was not "homebound" because he "owns and operates a motor vehicle when required." As in Carroll, where the claimant testified that he "sometimes read[], watched television, listened to the radio, [and rode] buses and subways," there is no evidence that Balsamo "engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job." 705 F.2d at 643. We have stated on numerous occasions that "a claimant need not be an invalid to be found disabled" under the Social Security Act. Williams v. Bowen, 859 F.2d 255, 260 (2d Cir. 1988) (quoting Murdaugh, 837 F.2d 99, 102 (claimant who "waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table" nevertheless disabled because could not perform sedentary work)). Moreover, "when a disabled person gamely chooses to endure pain in order to pursue important goals," such

-23-

>as attending church and helping his wife on occasion go
>shopping for their family, "it would be a shame to hold
>this endurance against him in determining benefits unless
>his conduct truly showed that he is capable of working."
>Nelson v. Bowen, 882 F.2d 45, 49 (2d Cir. 1989).

142 F.3d 75, 81-82 (2d Cir. 1998).

The ALJ erred in that he cited evidence of Ellington's
occasional outdoor activities as contrary finding that he was
disabled.   The Commissioner defends the ALJ's decision by
comparing Ellington's situation to that in Rivera.  But unlike
the claimant in Rivera, who performed many activities on a
daily basis, Ellington told the ALJ that he does not cook,
wash dishes, do laundry, or go shopping.  Instead, Ellington
testified that he occasionally takes short walks around his
neighborhood, takes short drives to medical appointments, and
watches television.  Given that taking walks and visiting his
doctor are important to Ellington's health, Ellington should
not be penalized for enduring pain while occasionally pursuing
important goals.  See Nelson v. Bowen, 882 F.2d 45, 49 (2d
Cir. 1989).   Thus, the Court finds that the ALJ committed
legal error in not properly applying the law as expressed in
Balsamo, and therefore remands for consideration consistent
with applicable law.

E.   THE DEVELOPMENT OF THE RECORD

Ellington further claims that the ALJ committed legal
error in failing to adequately develop the record.   In

-24-

particular, Ellington argues that the ALJ failed to obtain further evidence that would help rectify the claimed inconsistencies in Handago's findings and opinions. The Court disagrees. The cases that Ellington cites regarding the development of the record entail instances in which courts found that important medical findings were missing from the record. See Rosa, 168 F.3d at 79-80 (concluding that hospital records and notes from the treating physician were missing); Schaal, 134 F.3d at 505 (noting that a medical opinion was unsupported by medical findings and remanding for the purpose of determining what those medical findings were); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (observing that many medical records were missing, and of those submitted many were illegible).

Here, Ellington does not assert that medical records are missing, and, in fact, he admits "there is really nothing further to be obtained in terms of medical opinion evidence regarding the plaintiff's exertional impairments." (Plaintiff's Memorandum of Law in Support of his Motion for Judgment on the Administrative Record and Pleadings Pursuant to 12(c) F.R.C.P., dated March 12, 2009, at 17.) Ellington does not cite to additional documentation that the ALJ failed to obtain; instead, he suggests that Handago be asked to further explain what has already been submitted. The Court

-25-

will not impose a requirement that the ALJ question a doctor for the sole purpose of explaining a medical opinion that is already accompanied by medical findings.

### III. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that this case be remanded to the Commissioner of Social Security ("Commissioner") for further proceedings consistent with the Court's decision; and it is further

**ORDERED** that the motion of plaintiff Daniel C. Ellington for judgment on the pleadings and remand (Docket No. 8) is GRANTED in part and DENIED in part, as provided in this decision; and it is further

**ORDERED** that the Commissioner's motion for judgment on the pleadings (Docket No. 10) is DENIED.

The Clerk of Court is directed to close this case, subject to its being reopened as appropriate following the proceedings on remand directed herein.


**SO ORDERED.**

Dated:     New York, New York
           6 August 2009

                                        VICTOR MARRERO
                                           U.S.D.J.


-26-